1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| YOUNG WOO KIM, | ) Case No. CV 14-7944-JC |
| | ) |
| Petitioner, | ) MEMORANDUM OPINION AND |
| | ) ORDER DENYING PETITION FOR |
| v. | ) WRIT OF HABEAS CORPUS AND |
| | ) DISMISSING ACTION WITH |
| KEVIN CHAPPELL, Warden, | ) PREJUDICE[1] |
| | ) |
| Respondent. | ) |
| | ) |

17 **I.   SUMMARY**

18         On October 14, 2014, Young Woo Kim ("petitioner"), a state prisoner who

19 is represented by counsel, filed a Petition for Writ of Habeas Corpus by a Person

20 in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").[2]  Petitioner originally

21 asserted three grounds for relief, but voluntarily dismissed the first two grounds

22 after the Court concluded that they were unexhausted and rendered the Petition

23 "mixed" and subject to dismissal absent petitioner's election to dismiss the

24 unexhausted claims.  (Docket Nos. 30-32).  In his remaining claim, petitioner

25

26         [1]The parties have consented to proceed before the undersigned United States Magistrate

27 Judge.  (Docket Nos. 2, 14, 17).

28         [2]Since the Petition's internal page numbering is inconsistent, this Court cites to pages in
the order in which they have been scanned and appear on the docket.  (Docket No. 1).

1  argues that he was deprived of due process because there was insufficient

2  evidence to support his state convictions.  (Petition at 7, 20-24).  On March 15,

3  2016, respondent filed an Answer and a supporting memorandum ("Answer").  On

4  March 16, 2015 and March 15, 2016, respondent lodged multiple documents

5  ("Lodged Doc."), including the Clerk's Transcript ("CT") and the Reporter's

6  Transcript ("RT").  On May 10, 2016, petitioner filed a Reply.

7        For the reasons stated below, the Petition is denied, and this action is

8  dismissed with prejudice.

9  **II.   PROCEDURAL HISTORY**

10        On October 26, 2011, the Los Angeles County District Attorney filed an

11  Information charging petitioner and two co-defendants – Kyung Hwan Choi and

12  Andrew J. Kim – with conspiracy to commit first degree burglary (count 1; Cal.

13  Penal Code § 182(a)(1)), two counts of home invasion robbery (counts 2 & 3; Cal.

14  Penal Code § 211) (one count for each of the two victims who was present in the

15  home), first degree burglary (count 4; Cal. Penal Code § 459) and assault with a

16  stun gun or taser (count 6; Cal. Penal Code § 244.5(b)).[3]  (CT 160-64).  On

17  January 6, 2012, a Los Angeles County Superior Court jury found petitioner guilty

18  of the conspiracy and robbery counts (counts 1-3) and not guilty of the burglary

19  and assault charges (counts 4 & 6).[4]  (RT 2757-66; CT 295, 297-300).   As to

20  count 1, the jury found fourteen of fifteen alleged overt acts to be true.[5]  (CT 295-

21

22        [3]The Information did not include a "count 5."  (CT 160-64).

23        [4]Co-defendant Choi – who was jointly tried with petitioner but had a separate jury – was
24  found guilty of conspiracy and burglary (counts 1 & 4), but not guilty of the robberies (counts 2
   & 3).  (Lodged Doc. 3 at 15).  Co-defendant Kim entered into a cooperation agreement whereby
25  he agreed to plead guilty to the conspiracy charge and provide truthful testimony in exchange for
26  a sentence of five years probation.  (RT 1662-64).

27        [5]The jury found true overt acts ("OA") which essentially alleged the following:  Between
   September and October 2010, alleged co-conspirators David Chon and James Han met petitioner
28                                                                                    (continued...)

96).  As to counts 2 and 3, the jury found true allegations that petitioner acted in concert with two or more persons.  (CT 297-98).  On April 10, 2012, the court sentenced petitioner to a total of nine years in state prison.  (CT 491-92).

On August 5, 2013, the California Court of Appeal affirmed the judgment in a reasoned decision.  (Lodged Doc. 3).  On October 16, 2013, the California Supreme Court denied review without comment.  (Lodged Doc. 5).

## III.   FACTS

The instant case stems from the joint prosecution before separate juries of petitioner and Kyung Choi in connection with a conspiracy to commit burglary and the subsequent home invasion robbery which was physically carried out by certain of petitioner's co-conspirators and at which neither petitioner nor Kyung Choi were physically present.  Since petitioner challenges the sufficiency of the evidence to support his convictions, the Court has independently reviewed the state court record.  See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).  Based on such review, the Court adopts the following factual summary, which largely tracks the statement of facts in the opinion of the California Court of

---

[5](...continued)

and his co-defendant Kyung Choi at a Carl's Jr. in Los Angeles.  (OA 1).  Petitioner gave David Chon the victims' address (OA 2), and a home invasion robbery was discussed concerning such address (OA3).  David Chon was to receive half of the proceeds from the home invasion robbery that would pay his crew for executing the robbery, and petitioner and co-defendant Choi were to receive the other half of the proceeds from the residential burglary.  (OA 4).  The victims' house was staked out over ten times.  (OA 5).  On November 2, 2010, petitioner, co-defendant Choi, and alleged co-conspirators David Chon, James Han, Andrew Kim, Rene Hypolite, and "Alex" met at Carl's Jr.  (OA 6).  After that meeting, petitioner, co-defendant Choi, and alleged co-conspirator James Han entered a white Nissan owned by petitioner (OA 7), and co-defendant Alex Kim drove fellow alleged co-conpirators Rene Hypolite, David Chon and "Alex" in a Mercedes Benz owned by co-defendant Choi (OA 8) to the victims' address (OA 9).  Co-conspirators Hypolite and Chon waited in the victims' backyard (OA 10) and dragged victim Yoon Han inside the house (OA 12).  Victim Yoon Han's hands were bound and he was forced to lie on the kitchen floor.  (OA 13).  Victim Wan Han's hands were also bound and she was forced to lie on the bedroom floor.  (OA 14).  Co-conspirators Hypolite and Chon took personal property from the victims' home and left.  (OA 15).  (CT 295-96).

1   Appeal on direct review (Lodged Doc. 3 at 2-8), as a fair and accurate summary of
2   the evidence presented at trial.

3          On November 2, 2010, at approximately 8:00 p.m., Yoon Chan Han and his
4   wife, Wan Chong Han, returned to their home in Walnut from the golf shop they
5   own in Los Angeles.  (RT 641, 644-47, 929, 951).  Ms. Han went upstairs.  (RT
6   665, 930).  Mr. Han went out to the patio in the backyard to smoke.  (RT 649, 653-
7   54).  He was immediately approached by two masked individuals, who pushed him
8   into the house.  (RT 655, 659).  The men hit and kicked Han.  (RT 663).  They also
9   utilized a taser or stun gun on him.  (RT 659, 663-64).  Han fell near the living
10  room sofa and his hands were tied behind his back.  (RT 664-67).  The men went
11  around the home closing the drapes.  (RT 915-16).

12         Ms. Han heard her husband yelling.  (RT 670, 930-31).  She was about to go
13  downstairs when a man wearing a black ski mask and black clothes confronted
14  her.  (RT 931, 941, 953).  He tied her hands.  (RT 669-70, 932).  She was told, in
15  Korean, to lie on a chair and a blanket was thrown over her.  (RT 933-36, 954).
16  The man asked, "Lady, where's the money?"  (RT 938-39, 954).  She did not
17  respond.  (RT 939).  Later, a second man lifted the blanket and told her that if she
18  stayed still she would not be hurt.  (RT 940, 943, 956).

19         Downstairs, the other assailant began searching the kitchen.  (RT 667).  This
20  man returned and asked Han, in Korean, "Where's the money?"  (RT 6678-68).
21  The second man came back downstairs.  (RT 668).  They continued to ask for
22  money and Han responded that he had none.  (RT 668-69).  At one point, one of
23  the attackers spoke to someone on the phone.  (RT 668-69, 909).  As he talked, the
24  man walked up and down the stairs.  (RT 943-44, 956-58).  The Hans heard the
25  caller tell someone named Jason that they had looked through the house and there
26  was no money.  (RT 909-10, 943, 953).  The man who placed the call seemed to be
27  getting angry.  (RT 943).  After that conversation, the intruders continued to
28  search the home.  (RT 908).

4

Mr. Han heard noise coming from upstairs. (RT 911). Ms. Han had jumped off the second floor balcony. (RT 910, 943-44, 946-48). One of the men went upstairs and ran back down. (RT 91). He told his cohort that they had to get out of the house quickly. (RT 911). The two men left. (RT 911). Han was able to untie his hands and call for help. (RT 911-12).

Ms. Han went to her neighbor's house and told him to call the police quickly because there were robbers in her house. (RT 948-49). After the police arrived at the Hans' residence, Mr. Han walked through and saw that the place had been ransacked. (RT 914-16). The Hans lost a gold necklace, Ms. Han's Rolex watch, a ring, a wallet, a cell phone and cell phone batteries. (RT 916, 950, 959).

In January 2011, Charles Ro, a special agent with the Federal Bureau of Investigation, was working undercover. (RT 1252-54). On January 14, he had a conversation with a James Han (no relation of the victims). (RT 1254, 1286). As a result of that conversation, Ro spoke with a detective from the Los Angeles County Sheriff's Department and inquired about a home invasion robbery committed in November 2010. (RT 1256). He was provided a report of the Han robbery. (RT 1256).

On January 21, 2011, in a nightclub in Las Vegas, Ro spoke to petitioner and his co-defendant Kyung Choi. (RT 1256-57). Petitioner and his co-defendant referred to the home invasion robbery of the Hans. (RT 1258). Petitioner's co-defendant said he provided the address for the location of the robbery. (RT 1258). Petitioner said he knew that the victims owned a golf shop. (RT 1258-59). Petitioner's co-defendant stated he paid an employee of the shop for information regarding the owners' home, including the fact that large sums of money were kept at the location. (RT 1259, 1262). Petitioner's co-defendant said the robbery was unsuccessful because the perpetrators could not find the money; however, they took other valuables, including a Rolex watch. (RT 1259, 1261). Petitioner's co-defendant told Ro that James Han, Rene, and someone named Tubo carried out the

1  robbery.  (RT 1260-61, 1350, 1355).  During the conversation, petitioner

2  confirmed he knew the address of the home where the robbery was committed and

3  that the information regarding the home was received from an employee of the

4  victims' golf shop.  (RT 1264, 1288, 1349).  At no time did petitioner or his co-

5  defendant claim he was not involved in the robbery.  (RT 1350-51).

6       Los Angeles County Sheriff's Sergeant Steve Kim was an investigator

7  assigned to the Hans' robbery.  (RT 1046, 1379).  In January, Detective Thomas

8  Yu received information from Special Agent Ro, which caused Kim and Yu to

9  interview three individuals in Las Vegas regarding the robbery.  (RT 1048-50,

10  1381-84).  They spoke to James Han, Rene Hypolite, and David Chon, also known

11  as Tubo.  (RT 1049-50, 1381-84).

12       After the interviews, Sergeant Kim and Detective Yu returned to Los

13  Angeles County and on January 25, 2011, they conducted a probation search at the

14  home of Andrew Kim.  (RT 1040-41, 1050-51, 1385-87).  Detective Yu

15  questioned Kim at the residence and again at the police station after Kim was

16  arrested.  (RT 1387-88, 1657, 1839).  Both interviews were recorded and the

17  recordings were played for the jury.  (RT 1388, 1529, 1589, 1592, 2109-14; CT

18  207-88).

19       Kim, who was originally a defendant in this case, testified pursuant to an

20  agreement that he and his attorney signed, which stated that Kim would testify

21  truthfully against anyone involved in the home invasion robbery committed on

22  November 2, 2010.  (RT 1659, 1662-64).  In exchange, he would plead guilty to

23  conspiring to commit first degree burglary and would be placed on five years of

24  felony probation.  (RT 1663-64).  The agreement was to be performed after Kim

25  completed his testimony against all participants in the robbery.  (RT 1664).

26  ///

27  ///

28  ///

1    In his testimony, Kim confirmed he told Detective Yu that he knew James

2    Han, Rene Hypolite, David Chon, who went by the name of Tobu,[6] and co-

3    defendant Choi.  (RT 1582-87; CT 211-13, 215-17).  Kim met petitioner through

4    petitioner's co-defendant Choi in approximately August or September of 2010.

5    (RT 1587, 1807-08, 2164).

6    Sometime in September or October of 2010, Han came up with the idea of

7    committing a robbery.  (RT 1622-23; CT 215-16).  Kim, Han, co-defendant Choi,

8    and petitioner met and discussed the possibility of carrying out the crime.  (RT

9    1622; CT 215-17).  At the first meeting, both co-defendant Choi and petitioner

10   said they did not want to be part of any robbery.  (RT 1623-24).  The group

11   continued to talk about Han's idea, with most of the meetings taking place in a

12   Carl's Jr. lot on 6th Street and Virgil.  (RT 1628-29).  The group would talk in

13   either co-defendant Choi's Mercedes or petitioner's white Nissan.  (RT 1622-23,

14   1627, 2105; CT 217).  Eventually, co-defendaant Choi and petitioner decided they

15   would participate.  (RT 1624-25).  They told Han they had a victim in mind.  (RT

16   1625-26).  Petitioner said he received information that the potential victim had a

17   lot of money in his house.  (RT 1627).  Petitioner and co-defendant Choi said they

18   knew where this person worked.  (RT 1627).  They were going to follow him

19   home, check the house out, and get back to the group.  (RT 1627).

20   A few days later, petitioner, Kim, and Han met.  (RT 1628-30).  Petitioner

21   handed Han a piece of paper, which Han placed in his pocket.  (RT 1629-30,

22   2104).  Kim did not see what was written on the paper; however, he assumed

23   petitioner gave Han the address of the home that was targeted.  (RT 1629-30,

24   1831, 2159-60, 2165-66).  Several days passed.  (RT 1630-31).  Approximately a

25   week before the November 2 robbery, Kim drove Han to a house in Diamond Bar

26   ─────────────────

27   [6]Chon was referred to by various witnesses as Tubo, Tobu, or Tofu.  (RT 1367; 1613).
Special Agent Ro said that the word tubo in Korean means tofu or soybean.  (RT 1367).  Andrew

28   Kim stated that the word tobu means tofu.  (RT 1613).

at Han's direction.  (RT 1630-31).  Han told Kim to remember the house and threw the piece of paper he had received from petitioner out of the car window.  (RT 1630-31, 2166, 2195-96).

Planning for the robbery continued.  (RT 1632).  Han asked Kim to drive the men who were going to carry out the crime to the robbery site.  (RT 1632). Kim met those participants, who included David Chon, Alex Choi, and Rene Hypolite.  (RT 1632-35).  At a meeting, Han introduced Chon to petitioner and co-defendant Kyung Choi and the men agreed to commit the robbery together.  (RT 1635-37).  Kim understood that petitioner, co-defendant Kyung Choi, and Han were going to act as lookouts while the robbery was taking place.  (RT 2106-09, 2153).  Petitioner and Kyung Choi asked Han when he wanted to do the crime. (RT 1638).  Han said in a couple of days.  (RT 1638).  Petitioner told Han that he wanted to know the day of the robbery in advance because on the day the crime was to be committed, he wanted to conduct surveillance to make certain the victims left the house and arrived at their place of work.  (RT 1639).

On the day before the robbery, petitioner, co-defendant Kyung Choi, Han, and Kim met at the Carl's Jr. parking lot.  (RT 1639).  They agreed to meet there the next morning at 10:00 a.m.  (RT 1639-40).  Co-defendant Choi told Han to take Choi's Mercedes.  (RT 1640).

The next day, November 2, Kim drove to Han's house.  (RT 1640).  Kim and Han then drove to the Carl's Jr. lot in the Mercedes.  (RT 1641).  There, they met Chon and Hypolite, who arrived on foot.  (RT 1641).  Shortly thereafter, petitioner and co-defendant Choi  showed up at the parking lot in petitioner's Nissan.  (RT 1641).  Petitioner, co-defendant Choi, and Han then left in petitioner's  car.  (RT 1641-42, 2106).  Kim drove the Mercedes with Chon and Hypolite to pick up Alex Choi at Choi's home.  (RT 1642, 2104-06).  After collecting Alex Choi, Kim and the three men drove to the victims' house.  (RT 1642-43, 2105-06).

After Kim and the group arrived in the area of the targeted home, Kim drove around the block a couple of times.  (RT 1643).  He stopped two blocks away and Chon, Hypolite, and Alex Choi got out of the car.  (RT 1643).  After five or 10 minutes, they came back to the car, saying they could not get into the house.  (RT 1643-44).  Kim drove the car around the neighborhood and after a few minutes he stopped and the three men got out.  (RT 1644).  Again, they returned.  (RT 1644-45).  This time, they said that one of the neighbors was outside of his house.  (RT 1645).  It was around noon.  (RT 1645).  Kim drove to a nearby McDonald's, where he called Han and told him that twice the men had tried unsuccessfully to gain entry into the victims' house.  (RT 1645).  Han said to wait there.  (RT 1645).

After an hour, petitioner, Han, and co-defendant Kyung Choi arrived at the McDonald's lot.  (RT 1646).  Kim spoke to the three men and explained that his group could not get into the house because there was a neighbor outside.  (RT 1647-48).  Kim said he wanted to drive back to Los Angeles.  (RT 1648).  They said that was fine.  (RT 1648).

Kim drove Chon, Hypolite, and Alex Choi to Han's house.  (RT 1648-49).  After staying at Han's house for several hours, Kim received a phone call from his mother.  (RT 1649).  Driving his car, Kim left to have dinner with his family.  (RT 1649-50, 1838).  Kim and Han continued to communicate that evening via cell phone.  (RT 1650-51).

Sometime after 8:00 p.m., Han sent Kim a text message, stating that they got into the house.  (RT 1651).  Kim was picked up by a friend and driven to a parking lot across the street from Carl's Jr.  (RT 1652).  Petitioner, co-defendant Kyung Choi, and Han were waiting in the lot.  (RT 1652).  Petitioner said because the perpetrators of the robbery, Chon, Hypolite, and Alex Choi, discovered that Ms. Han had escaped, they left the house.  (RT 1653).  Han said nothing was found in the victims' house except jewelry.  (RT 1653).  Han had a lady's watch and a couple of bracelets in his hands.  (RT 1654).  He tried to give them to petitioner.

1   (RT 1654).  Petitioner told him to keep the jewelry because it was not worth much

2   money.  (RT 1654).  Petitioner took the small pouch that Han used to carry the

3   jewelry.  (RT 1654-55).

4        Kim did not know how much money was supposed to be inside the victims'

5   house.  (RT 1655, 2121).  He understood that half of the proceeds were to be split

6   among petitioner, co-defendant Kyung Choi, and Han.  (RT 1655).  The remainder

7   was to be shared by Kim, Chon, Hypolite, and Alex Choi.  (RT 1655).

8        On January 25, 2011, prior to Kim's arrest, petitioner called and told Kim to

9   meet him at the Grove.  (RT 2124-25; CT 275, 278).  When Kim arrived,

10  petitioner and co-defendant Kyung Choi asked whether he had heard that Han and

11  the others had been arrested in Las Vegas.  (RT 2125; CT 278-79).  Petitioner and

12  co-defendant Choi wanted to determine if Kim knew whether the men had been

13  released.  (CT 278).  Kim said he did not know.  (CT 278).

14       After the second January 25 interview at the police station, Kim bailed out

15  of custody.  (RT 1673, 2198).  He assisted authorities in the arrest of petitioner,

16  which occurred on January 26.  (RT 2180-83, 2198).  At the time of his arrest,

17  petitioner was driving a white Nissan.  (RT 999, 2199).

18       On January 26, 2011, Sergeant Steve Kim interviewed petitioner.  (RT 998).

19  The parties spoke Korean.  (RT 1000).  After being advised of his constitutional

20  rights, petitioner was asked whether he had a relationship with co-defendant

21  Kyung Choi.  (RT 1000-02).  He responded that he and Choi had been friends for

22  about five years.  (RT 1002-03).  Kim asked petitioner what he knew about the

23  November home invasion robbery of the Hans.  (RT 1003).  Petitioner said he had

24  attended several meetings that included co-defendant Choi and someone named

25  James, and Choi and James discussed how they were going to carry out the

26  robbery.  (RT 1003).  The meetings took place inside Choi's Mercedes Benz that

27  was parked in a Carl's Jr. lot near 6th and Virgil in Los Angeles.  (RT 1005).  On

28  one occasion, James asked Choi if he knew of a location where money could be

1   obtained.  (RT 1004).  Choi wrote down an address and handed it to James.  (RT
2   1004, 1006-07).  According to Choi, the manager of a golf shop told him that the
3   owners had $500,000 stashed in their house.  (RT 1004-05, 1007).  At one
4   meeting, two individuals named Tofu and Rene attended.  (RT 1006).  James
5   explained that they were going to carry out the robbery.  (RT 1006).  Petitioner
6   denied being involved.  (RT 1010, 1021).

7          After the robbery took place, petitioner, co-defendant Choi, Han, Tofu, and
8   Rene met in the Carl's Jr. parking lot.  (RT 1007).  Han handed Choi a woman's
9   Rolex watch and a couple of rings that were taken during the robbery.  (RT 1007-
10  08).  Han said Tofu and Rene were unable to find any money in the home.  (RT
11  1008).  Petitioner denied taking any of the jewelry; however, he acknowledged he
12  took possession of the bag that held the jewelry, which he later discarded.  (RT
13  1010, 1031-32).

14         Petitioner repeatedly stated that he did not participate in the robbery and did
15  not receive a share of the proceeds.  (RT 1010, 1021).  He said he was merely a
16  spectator to the planning of the crime and the meeting after it occurred.  (RT 1010,
17  1028, 1053).

18         DNA taken from a ski mask that was found outside the Hans' home matched
19  the DNA profile of Rene Hypolite.  (RT 968-72, 975-76, 1232, 1243).  The
20  criminalist received DNA samples of other individuals, including James Han and
21  David Chon.  (RT 1233).  Neither petitioner's nor co-defendant Kyung Choi's
22  sample was among those received.  (RT 1237-38).  There were no other DNA
23  matches.  (RT 1234).

24  **IV.    STANDARD OF REVIEW**

25         This Court may entertain a petition for writ of habeas corpus on "behalf of a
26  person in custody pursuant to the judgment of a State court only on the ground that
27  he is in custody in violation of the Constitution or laws or treaties of the United
28  States."  28 U.S.C. § 2254(a).  A federal court may not grant an application for

writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).[7]

In applying the foregoing standards, federal courts look to the last reasoned state court decision.  See Smith v. Hedgpeth, 706 F.3d 1099, 1102 (9th Cir.), cert. denied, 133 S. Ct. 1831 (2013).  Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Cannedy v. Adams, 706 F.3d 1148, 1158 (9th Cir. 2013) (it remains Ninth Circuit practice to "look through" summary denials of discretionary review to the last reasoned state-court decision), as amended on denial of rehearing, 733 F.3d 794 (9th Cir. 2013), cert. denied, 134 S. Ct. 1001 (2014); but see Kernan v. Hinojosa, 136 S. Ct. 1603, 1605-06 (2016) (Ylst presumption is rebuttable; strong evidence can refute it).

///

///

///

///

///

---

[7]When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  Harrington v. Richter, 562 U.S. 86, 99 (2011); see also Johnson v. Williams, 133 S. Ct. 1088, 1094-96 (2013) (extending Richter presumption to situations in which state court opinion addresses some, but not all of defendant's claims).

1  **V.   DISCUSSION**[8]

2       Petitioner contends that the evidence was insufficient to support his

3  convictions, particularly given (1) cooperator Alex Kim's asserted lack of

4  credibility and the assertedly uncorroborated nature of his testimony; (2) the

5  assertedly inconsistent verdicts rendered by petitioner's jury and co-defendant

6  Choi's jury – *i.e.*, that co-defendant Choi's jury found Choi guilty of conspiracy

7  and burglary, but not guilty of robbery, whereas petitioner's jury found petitioner

8  guilty of conspiracy and robbery, but not guilty of burglary; and (3) "certain

9  [unspecified] evidentiary rulings." (Petition at 7, 20-22; Reply at 1-6).  The

10 California Court of Appeal – the last state court to issue a reasoned decision

11 addressing petitioner sufficiency of the evidence claims – rejected such claims on

12 the merits on direct appeal.  (Lodged Doc. 3 at 13-16).  Petitioner is not entitled to

13 federal habeas relief on such claims.

14      **A.   Pertinent Law**

15      On habeas review, a court's inquiry into the sufficiency of the evidence is

16 subject to two layers of judicial deference.  Coleman v. Johnson, 132 S. Ct. 2060,

17 2062 (2012) (per curiam).  First, on direct appeal, "it is the responsibility of the

18 jury – not the court – to decide what conclusions should be drawn from evidence

19 admitted at trial.  A reviewing court may set aside the jury's verdict on the ground

20 of insufficient evidence only if no rational trier of fact could have agreed with the

21 jury."  Id. (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam)); see

22 Jackson v. Virginia, 443 U.S. 307, 319 (1979) (standard of review on sufficiency

23 of the evidence claim is whether, "after viewing the evidence in the light most

24 favorable to the prosecution, *any* rational trier of fact could have found the

25 essential elements of the crime beyond a reasonable doubt") (emphasis in

26

27 ─────────────────

28      [8]The Court has read, considered and rejected on the merits all of petitioner's contentions.
The Court discusses petitioner's principal contentions herein.

13

1   original); Coleman, 132 S. Ct. at 2065 ("[T]he only question under Jackson is

2   whether [the jury's] finding was so insupportable as to fall below the threshold of

3   bare rationality.").

4       Second, on habeas review, "a federal court may not overturn a state court

5   decision rejecting a sufficiency of the evidence challenge simply because the

6   federal court disagrees with the state court.  The federal court instead may do so

7   only if the state court decision was 'objectively unreasonable.'"  Coleman,

8   132 S. Ct. at 2062, 2065 (state court determination that jury's finding was not so

9   insupportable as to fall below the threshold of bare rationality is entitled to

10  considerable deference on habeas review) (citations omitted); see Juan H. v. Allen,

11  408 F.3d 1262, 1274-75 (9th Cir. 2005) (as amended) (federal habeas relief may

12  be granted only if state court's adjudication of insufficiency of the evidence claim

13  involved unreasonable application of Jackson to the facts of the case), cert. denied,

14  546 U.S. 1137 (2006).[9]

15      Sufficiency of the evidence claims are judged by the elements defined by

16  state law.  Jackson, 443 U.S. at 324 n.16.  Evidence must be considered in the light

17  most favorable to the prosecution.  Id. at 319.  The testimony of a single witness is

18  sufficient to sustain a conviction.  Bruce v. Terhune, 376 F.3d 950, 957-58 (9th

19  Cir. 2004) (per curiam).  Circumstantial evidence and the inferences drawn

20  therefrom also may be sufficient to sustain a conviction.  Ngo v. Giurbino, 651

21  F.3d 1112, 1114-15 (9th Cir. 2011) (citations omitted).

22      Under California law, a conviction of conspiracy requires proof that the

23  defendant and another person had the specific intent to agree or conspire to

24  commit an offense, as well as the specific intent to commit the elements of that

25  offense, together with proof of the commission of an overt act by one or more of

26

27      [9]The California standard for determining the sufficiency of evidence to support a
conviction is identical to the federal standard enunciated in Jackson.  People v. Johnson, 26 Cal.

28  3d 557, 576 (1980).

the parties to such agreement in furtherance of the conspiracy.  People v. Johnson, 57 Cal. 4th 250, 257 (2013); CALJIC 6.10.  Here, as noted above, petitioner was convicted of conspiracy to commit first degree burglary.

Under California law, the elements of first degree burglary are:  (1) a person entered into a specified structure (here, an "inhabited dwelling house");[10] and (2) at the time of the entry, that person had the specific intent to commit theft or any felony.  See People v. Tafoya, 42 Cal. 4th 147, 170-71 (2007), cert. denied, 552 U.S. 1321 (2008); see also Cal. Penal Code §§ 459, 460; CALJIC 14.50, 14.51.  "[T]he gist of the offense [of burglary] is *entry* with the proscribed intent . . . such an entry constitutes the completed crime of burglary 'regardless of whether. . . any felony or theft actually is committed.'"  People v. Allen, 21 Cal. 4th 846, 863 n. 18 (1999) (citation omitted).

In California, a robbery conviction requires proof of "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  Cal. Penal Code § 211; CALJIC 9.40; People v. Scott, 45 Cal. 4th 743, 749 (2009).

A defendant may be liable for the commission of a substantive crime (such as burglary or robbery) under an aiding and abetting theory.  People v. Prettyman, 14 Cal. 4th 248, 259 (1996) ("Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator.") (citing Cal. Penal Code § 31); see also People v. Smith, 60 Cal. 4th 603, 611 (2014) (citing id.).  A defendant may be found guilty as a principal for aiding and abetting a particular crime perpetrated by another person (*i.e.*, a "target crime") if it is established that the defendant (1) acted with "knowledge of the unlawful purpose of the perpetrator"; (2) acted with "the intent

---

[10]Under California law, "inhabited" means "currently being used for dwelling purposes, whether occupied or not."  Cal. Penal Code § 459.

15

1   or purpose of committing, encouraging, or facilitating the commission of the

2   [target crime]"; and (3) by act or advice, aided, promoted, encouraged or

3   instigated, the commission of that crime.  Prettyman, 14 Cal. 4th at 259 (quoting

4   People v. Beeman, 35 Cal. 3d 547, 561 (1984)) (quotation marks omitted).  A

5   defendant's presence at the scene of the target crime, companionship with the

6   principal, and conduct before and after the crime are among several factors which

7   may be considered in determining whether the defendant had the requisite

8   knowledge and intent.  People v. Campbell, 25 Cal. App. 4th 402, 409 (1994).

9        An aider and abettor is liable for not only the intended, or target, offense

10  committed by a direct perpetrator, "but also of any other crime the direct

11  perpetrator actually commits that is a natural and probable consequence of the

12  target offense."  People v. Mendoza, 18 Cal. 4th 1114, 1123 (1998) (citing People

13  v. Prettyman, 14 Cal. 4th at 260-62); see also People v. McCoy, 25 Cal. 4th 1111,

14  1117 (2001) (noting that aider and abettor's liability for criminal conduct is of two

15  kinds – aider and abettor with necessary mental state is guilty of intended crime,

16  whereas, under natural and probable consequences doctrine, aider and abettor is

17  guilty not only of intended crime, but also of any other offense that was natural

18  and probable consequence of crime aided and abetted) (internal quotation marks

19  and citations omitted).

20       Similarly, a defendant who is a member of a conspiracy is not only guilty of

21  the particular crime that to his knowledge his confederates are contemplating

22  committing, but is also liable for the natural and probable consequences of any act

23  of a co-conspirator to further the object of the conspiracy, even though such an act

24  was not intended as a part of the original plan and even though he was not present

25  at the time of the commission of such an action.  See People v. Morante, 20 Cal.

26  4th 403, 417 (1999); CALJIC  6.11.

27  ///

28  ///

16

**B.    Analysis**

Petitioner is not entitled to relief on his claim that the evidence was insufficient to support his conspiracy to commit burglary and his robbery convictions as such claim was reasonably rejected by the California Court of Appeal.

As the Court of Appeal explained, the testimony of Andrew Kim alone was sufficient to support the verdicts:

> [Andrew Kim] stated that [petitioner] assisted Kyung Choi and James Han in concocting a plan to break into the victims' home. Through an employee of the victims' golf shop, [petitioner] learned that they kept large sums of cash in their house. [Petitioner] provided Han with the address to the victims' residence. [Petitioner] was aware the robbery was going to be committed, he knew who was going to carry out the crime and was a willing participant. He also had a direct hand in the commission of the crime, as he was to act as a lookout while the others went into the victims' home. Finally, after the robbery, he met with the other participants to distribute the proceeds of the crime. Those facts, if believed, were sufficient to establish that [petitioner] conspired to commit a burglary and participated in the robberies.

(Lodged Doc. 3 at 14). This Court agrees. The testimony of a single witness is sufficient to uphold a conviction. See United States v. Larios, 640 F.2d 938, 940 (9th Cir. 1981) (citations omitted); United States v. Jones, 425 F.2d 1048, 1055 (9th Cir.), cert. denied, 400 U.S. 823 (1970); see also United States v. Foster, 243 Fed. Appx. 315, 316 (9th Cir. 2007) (even testimony of one witness, if believed, sufficient to support conviction; resolution of any question as to credibility properly entrusted to jury). Moreover, as detailed further below, petitioner's own admissions to Sergeant Steve Kim and the statements made to Detective Ro by

///

17

1   petitioner and by co-defendant Choi in petitioner's presence further lend credence

2   to Andrew Kim's testimony incriminating petitioner.

3        Although petitioner points to multiple issues regarding Andrew Kim's

4   credibility, and the lack of physical or scientific evidence tying petitioner to the

5   crimes, these arguments were already made to, and rejected by, the jury at trial.

6   (RT 2442-65 (petitioner's counsel's closing argument)).  In presenting these

7   arguments again, petitioner essentially is asking this Court to reweigh the

8   evidence.  However, the Court may not do so on federal habeas review.  See

9   Cavazos, 132 S. Ct. at 7 n.* (reweighing facts precluded by Jackson); United

10  States v. Nevils, 598 F.3d 1158, 1170 (9th Cir. 2010) (in assessing sufficiency of

11  the evidence claim, it is not court's function to reweigh the evidence) (citation and

12  quotation marks omitted).  The only issue before this Court is whether it was

13  objectively unreasonable for the Court of Appeal to determine that a rational trier

14  of fact could have found beyond a reasonable doubt that petitioner was criminally

15  liable for the charged crimes.  In this case, such question must be answered in the

16  negative.

17       Petitioner, relying upon California Penal Code section 1111 – which

18  essentially provides that the testimony of an accomplice must be corroborated –

19  essentially claims that Kim's testimony was not sufficient to support the jury's

20  verdict because it was "uncorroborated."  Although corroboration of accomplice

21  testimony is required under California state law, the United States Supreme Court

22  has indicated that corroboration of accomplice testimony is not constitutionally

23  mandated.  See United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we

24  look at the requirements of procedural due process, the use of accomplice

25  testimony is not catalogued with constitutional restrictions.").  Indeed, under

26  Ninth Circuit law, "[t]he uncorroborated testimony of an accomplice is enough to

27  sustain a conviction unless the testimony is incredible or unsubstantial on its

28  face."  United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) (citations

18

omitted); see also Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000)
(characterizing California Penal Code section 1111 as a state statutory rule, and
noting that, to the extent uncorroborated testimony is not incredible or
insubstantial on its face, the rule is not required by the Constitution or federal law;
where accomplice's testimony is neither incredible nor insubstantial on its face,
habeas relief is required only if alleged violation of Section 1111 denied petitioner
due process right to fundamental fairness, *i.e.*, if the State arbitrarily deprived
petitioner of state law entitlement) (citations omitted).  Here, notwithstanding
Andrew Kim's credibility issues, the Court cannot find that his testimony
incriminating petitioner was "incredible" or "insubstantial" on its face.

Moreover,  the California Court of Appeal reasonably found that Section
1111's corroboration requirement was satisfied because Andrew Kim's testimony
was corroborated by petitioner's own statements to Sergeant Steve Kim and with
the testimony of Special Agent Ro.  (Lodged Doc. 3 at 16).  As the Court of
Appeal explained:

> [Petitioner's] statement to Sergeant Kim provided substantial
> corroboration for Andrew Kim's testimony.  Consistent with Kim's
> testimony, [petitioner] admitted:  (1) he attended several meetings
> during which codefendant Choi and "James" discussed how they were
> going to carry out the robbery; (2) the meetings took place inside
> Choi's Mercedes Benz that was parked in a Carl's Jr. parking lot near
> 6th and Virgil; (3) Choi learned from the manager of the victims' golf
> shop that they had a substantial amount of cash stashed in their house;
> (4) Tofu (David Chon) and Rene carried out the robbery; (5) after the
> robbery, he met with Choi, James, Tofu, and Rene in the Carl's Jr.
> parking lot; (6) James handed Choi a woman's Rolex watch and other
> jewelry; (7) James said Tofu and Rene were unable to find any money
> in the house; and (8) he took possession of the jewelry pouch.

1          Special Agent Ro's testimony corroborated Kim's statement

2    that [petitioner] was a willing participant in the crimes and not a mere

3    bystander, as [petitioner] claimed.  During Ro's meeting with

4    [petitioner] and Choi in Las Vegas, [petitioner] referred to the

5    robbery of the Hans.  [Petitioner] said he knew:  (1) the victims

6    owned a golf shop; (2) an employee of the shop provided information

7    that the victims kept large sums of money in their home; and (3) the

8    address of the victims' home.  He was also present when Choi

9    provided Ro with specific details of the robbery, including the names

10   of the perpetrators and the fact that they could not find the money and

11   took other valuables, including a Rolex watch.  Significantly, at no

12   time did [petitioner] claim he was not involved in the robbery.

13   (Lodged Doc. 3 at 16).  This Court agrees with the Court of Appeal's findings

14   which are well supported by the record and with its well-reasoned legal analysis.[11]

15         Petitioner also contends that the evidence did not support his convictions

16   because of assertedly inconsistent verdicts rendered by petitioner's jury and co-

17   defendant Choi's jury – *i.e.*, that co-defendant Choi's jury found Choi guilty of

18   conspiracy and burglary, but not guilty of robbery, whereas petitioner's jury found

19   petitioner guilty of conspiracy and robbery, but not guilty of burglary.  However,

20   in the absence of any legal authority to support this assertion, the Court of Appeal

21   properly rejected it, and noted that each defendant's case was heard by a different

22   jury, and that the assertion was without merit.  (Lodged Doc. 3 at 15).  This Court

23   _____

24       [11]To the extent petitioner claims that his statements to Sergeant Kim should not be

25   considered in assessing the sufficiency of the evidence or whether Andrew Kim's testimony was
     adequately corroborated under Section 1111 (Reply at 6), this Court agrees with the Court of

26   Appeal's rejection of such contentions.  (Lodged Doc. 3 at 12-13, 15).  The record amply
     supports the Court of Appeal's determination that there was no violation of Miranda v. Arizona,

27   384 U.S. 436 (1966), and instead that petitioner was properly advised of and understood his

28   Miranda rights and nonetheless chose voluntarily to speak to Sergeant Kim.  (RT 983-87, 998-
     1002).

agrees.  Inconsistent verdicts do not furnish grounds for habeas relief.  See, e.g., Harris v. Rivera, 454 U.S. 339, 345 (1981) (per curiam) ("Inconsistency in a verdict is not a sufficient reason for setting it aside.  We have so held with respect to inconsistency between verdicts on separate charges against one defendant, Dunn v. United States, 284 U.S. 390 [] (1932)[], and also with respect to verdicts that treat codefendants in a joint trial inconsistently, United States v. Dotterweich, 320 U.S. 277, 279 [] (1943) [].) (parallel citations and footnotes omitted); Standefer v. United States, 447 U.S. 10 (1980) (a defendant accused of aiding and abetting in the commission of a federal offense may be convicted after the named principal has been acquitted of that offense in a previous trial); United States v. Upshaw, 685 F.2d 1202 (9th Cir. 1982) (per curiam) (rejecting defendant's contention that acquittal of co-defendant rendered guilty verdict inconsistent, noting that Supreme Court had recently cautioned against inferring too much from apparently inconsistent verdicts) (citing Harris). The Court follows such admonition here, particularly in light of the fact that different juries considered the cases against petitioner and co-defendant Choi and each jury's verdict is entitled to deference.

Finally, petitioner contends that "certain [unspecified] evidentiary rulings" undermine the sufficiency of the evidence to support his conviction.  This claim is rejected both because it is entirely conclusory and gives the Court no basis to discern which evidentiary rulings are even in issue (see James v. Borg, 24 F.3d 20, 26 (9th Cir.), cert. denied, 513 U.S. 935 (1994)) and because a court considering a sufficiency of the evidence claim must consider all evidence admitted at trial regardless of whether it should have been admitted.  McDaniel v. Brown, 130 S. Ct. 665, 672 (2010) (a court reviewing a claim of insufficiency of the evidence must consider all evidence admitted at trial, regardless of whether the evidence should have been admitted).

///

1

**VI.     CONCLUSION**

2          IT IS THEREFORE ORDERED that:  (1) the Petition is denied and this

3   action is dismissed with prejudice; and (2) the Clerk shall enter judgment

4   accordingly.

5          IT IS SO ORDERED.

6   DATED:  May 31, 2016

7                                                    /s/
                                        _____

8                                        Honorable Jacqueline Chooljian
                                        UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28